(Docket No. 41328.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
ROBERT HUDSON, Appellant.

*Opinion filed September 29, 1970.*

KLUCZYNSKI and WARD, JJ., took no part.

JULIUS LUCIUS ECHELES, and FREDERICK F. COHN, both of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and LAURENCE J. BOLON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE CREBS delivered the opinion of the court:

Robert Hudson, herein referred to as defendant, and Harold Riggins were tried by jury in the circuit court of Cook County for the crimes of murder and attempted robbery, resulting in a verdict of guilty on both charges as to each defendant. The jury fixed Hudson's punishment at death on the murder conviction and the court sentenced him

to death. This appeal is by Hudson alone from the murder conviction and death sentence.

Two of defendant's claims relate to the manner in which the jury was selected. He first contends that the court erred in ruling that the State was entitled to peremptory challenges. This claim is based upon the following circumstances. Prior to August 11, 1967, the applicable statute provided as follows: "Each defendant shall be allowed 20 peremptory challenges in capital cases, 10 in all cases in which the punishment may be imprisonment in the penitentiary and 5 in all other cases. The State shall be allowed the same number of peremptory challenges as all of the defendants." (Ill. Rev. Stat. 1965, ch. 38, par. 115—4(e).) On August 11, 1967, the provision was amended so as to read as follows: "A defendant tried alone shall be allowed 20 peremptory challenges in a capital case, 10 in a case in which the punishment may be imprisonment in the penitentiary, and 5 in all other cases; except that, in a single trial of more than one defendant, each defendant shall be allowed 12 peremptory challenges in a capital case, 6 in a case in which the punishment may be imprisonment in the penitentiary, and 3 in all other cases. If several charges against a defendant or defendants are consolidated for trial, each defendant shall be allowed peremptory challenges upon one charge only, which single charge shall be the charge against that defendant authorizing the greatest maximum penalty." Ill. Rev. Stat. 1967, ch. 38, par. 115—4(e).

It will be noted that prior to the amendment the statute specifically provided that the State should be allowed the same number of peremptory challenges as all of the defendants, while the amended section omitted that provision. However, in the section dealing with the selection of alternate jurors the amended section provided that "Each party shall have one *additional* peremptory challenge for each alternate juror." (Emphasis supplied.) Ill. Rev. Stat. 1967, ch. 38, par. 115—4(g).

Defendant argues that the omission of the provision giving the State the right to exercise peremptory challenges deprives the State of that right. A problem of statutory construction is involved. Both the defendant and the State have referred us to certain rules of statutory construction which we need not set forth in detail here. While such rules may be helpful in certain circumstances in construing a statute it is well established that such rules are merely an aid for determining the intent of the legislature and must yield when the intent of the legislature is otherwise indicated. (Sutherland, Statutory Construction, sec. 1932, 3d ed. 1943.) The situation in this case is quite similar to that in *People ex rel. Cason* v. *Ring*, 41 Ill.2d 305. In that case an amendment to the Election Code in 1967 had removed certain language granting registered voters the right to apply to the county clerk for the erasure of names of unqualified voters for the 1968 general election. The court reviewed the history of the legislation and noted that such a procedure had been in effect for 25 years prior to 1968 and was available in 1970. The court held, citing numerous authorities, that an act of the legislature would not be construed so as to lead to absurd, inconvenient or unjust consequences and that a construction would be adopted which it was reasonable to presume was contemplated by the legislature. Again referring to other authorities, the court in *Ring* noted that in a proper case words omitted by the legislature may be supplied. The court in that case construed the amendment so as to provide for the erasure right in 1968 although the literal reading of the statute precluded the exercise of that right. Here, while a literal reading of the amendment indicates that the State had no right to exercise peremptory challenges, we are satisfied that the omission of language in the amendment giving that right was an oversight on the part of the legislature and cannot have been intended. Our conclusion is fortified by the facts that the State's right to peremptory challenge had existed for many

years; that the legislature expressly provided for an "additional" challenge for an alternate juror (Ill. Rev. Stat. 1967, ch. 38, par. 115—4(g)); and by the fact that in 1968 the right was expressly restored. (Laws of 1968, page 43.) We are therefore of the opinion that the trial court properly ruled that the State had the right to exercise peremptory challenges.

The defendant's second contention with respect to the manner in which the jury was selected is based upon *Witherspoon* v. *Illinois* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The court in *Witherspoon* held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been removed for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. (*Bumper* v. *State of North Carolina*, 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788.) We have reviewed the entire *voir dire* examination of the prospective jurors and find that 21 prospective jurors were excused on the ground that they had religious or conscientious scruples against imposing the death penalty. We do not believe it necessary to recite here the details of that examination. We are satisfied that a large number of such prospective jurors were excused because, "without more," they stated that they had such scruples. The circumstances present in *People* v. *Speck*, 41 Ill.2d 177, and other cases in which we have held the examination proper under *Witherspoon* standards, are not present here. While this does not require the vacation of the judgment of conviction, the sentence of death cannot be permitted to stand.

Defendant also presents a double jeopardy claim and a contention that he was denied a speedy trial. Both of these claims arise because of a prior mistrial which was declared because of the inability of the jury to reach a verdict. It appears that defendant was arrested on May 22, 1967, and confined without bail. The first trial commenced on Sep-

tember 15, 1967, and the order declaring the mistrial was entered on September 21. The second trial resulting in the verdict and judgment now under consideration commenced on November 15 and defendant's motion for discharge under section 103—5 of the Code of Criminal Procedure was denied on November 14. Prior to the decision of this court in *People* v. *Gilbert*, 24 Ill.2d 201, it was the rule that the statutory four-month period commenced to run anew from the date of the disagreement of a jury. (*People* v. *Jonas*, 234 Ill. 56, 60.) However, in *Gilbert*, where we held that the defendant's right to a speedy trial had not been violated, we stated that "Our decision in this case does not mean that in every instance of a mistrial, the full statutory period begins to run anew, regardless of the length of time that has already elapsed. The overriding consideration is the constitutional right to a speedy trial, and where delay is not attributable to the defendant, that right is not measured by aggregating successive periods of four months each." (24 Ill.2d at 204-5.) Thus, although defendant was tried within four months after the disagreement of the jury in the first trial, that fact is not conclusive. The record shows here that counsel for the defendant took care to insure that he did not waive the defendant's right to a speedy trial by moving for a continuance or expressly consenting to a continuance. However, the record also shows that defendant's counsel did not object to a continuance of the cause. At one point in the proceeding where counsel for the co-defendant also requested a continuance defendant's attorney stated, "Your Honor, as far as I am concerned, what I shall ask the court to do is set this matter for trial at some future date, and then, in addition, I am trying to avoid coming in on Wednesday." Counsel was then asked if it was agreeable with him to set the matter down for a certain date and he replied that it was and that any date was agreeable with him which was agreeable to the court and the State. Defendant was tried within 55 days following the mistrial and

within 177 days of his incarceration. There were problems arising out of the death of the attorney who had represented a co-defendant and problems as to whether a severance should be ordered, and a delay of 55 days was not unreasonable. Defendant has made no claim of actual prejudice by reason of the delay and we find no evidence of prejudice in the record. Under all the circumstances of this case we are of the opinion that neither defendant's right to a speedy trial under the constitution nor his statutory right to be tried within 120 days was violated.

Defendant's claim of double jeopardy also arises out of his retrial following the disagreement of the jury and the mistrial. At the second trial several witnesses testified for the State who had not testified at the first trial. The most significant of these witnesses was Carl McFadden, who had been indicted for the crime with defendant and Harold Riggins. As we will point out later in this opinion the testimony of McFadden was an important part of the State's case. Defendant contends that the presentation of this additional evidence at the second trial violated defendant's right not to be placed in double jeopardy. In support of that claim the defendant refers to authorities holding that where the prosecution fails to present to the jury sufficient evidence at a first trial, resulting in a verdict of acquittal, the State cannot obtain a new trial by demonstrating that they have additional evidence. These authorities are not relevant to the issue here, since the first trial did not result in a judgment of acquittal. Principal reliance is placed upon *Downum* v. *United States,* 372 U.S. 734, 10 L. Ed. 2d 100, 83 S. Ct. 1033. In that case, after a jury had been selected and sworn, the prosecutor moved that the jury be discharged because one of its key witnesses was not present. The court granted the motion and two days later, when the witness had been located, the defendant was placed on trial and convicted. The Supreme Court reversed the judgment of conviction holding that the defendant's plea of former

jeopardy should have been sustained. That case is likewise readily distinguishable from the present case. In the *Downum* case, the court pointed out that ever since 1824 it had been agreed that there were occasions where a second trial may be had although the jury impaneled for the first trial was discharged without reaching a verdict and without the defendant's consent. In its opinion the court referred to the case of a mistrial where the jury is unable to agree as the classic example of such cases. That was exactly the situation here. The jury was discharged and a mistrial declared, not because of the prosecutor's plea that he needed time to obtain additional evidence, but because the jurors were unable to agree. Under these circumstances, we know of no rule, and counsel for defendant has produced no authority to that effect, holding that the prosecution is precluded from introducing additional evidence at a second trial. In our opinion defendant's constitutional right not to be placed twice in jeopardy for the same offense was not violated.

Defendant also argues that the evidence was insufficient to establish his guilt and claims that certain identification testimony was improperly admitted. These claims require a consideration of the evidence at the trial.

The victim of the murder was killed during the armed robbery of his coin and gun shop. A customer who was present at the time, Ludwig Debus, testified that he observed two men enter the store. One of them was armed with a revolver and announced that it was a holdup. Debus testified that the defendant was the man with the gun. An alarm went off and defendant stepped behind the counter and fired three times at the deceased. The defendant then faced Debus, who begged him not to shoot. Defendant walked out the door, looking at Debus over his shoulder. From the time of the announcement of the holdup until the time defendant left the store about 30 seconds elapsed. About 50 minutes or an hour later Debus saw the defendant in the

store in the custody of a policeman. On cross-examination he testified that he was unable to identify any of the other suspects in the case.

Carl McFadden testified that the co-defendant, Harold Riggins, called him saying that he "got something up" and that it would be worth a couple of thousand dollars. McFadden told Riggins that he would consider it, and a short time thereafter Riggins called him again and McFadden told him that he would go along. Riggins told him that "a dude" would pick him up, and a short time after the call, the defendant drove by and picked him up in a car. McFadden talked to the defendant about the proposed crime and the defendant told him that it was a coin shop and that he could arrange to get rid of the coins. They drove to a residence where they went in and found Riggins and another person identified only as "John." Riggins told McFadden and the defendant that it would be a push-over because there was only one old fellow in the store. Riggins outlined the plan, which was for McFadden and the defendant to go into the store and when Riggins appeared in the door it would be the signal for the defendant to announce a stick-up. Before proceeding to the coin shop they went to a drug store where they bought some cotton, some tape and some gloves. Riggins told McFadden that he should wear gloves because he would have his hands all over everything in the store. They bought the supplies and the defendant put the cotton in his jaws, apparently to change his appearance, and Riggins put the tape over his mustache. They then proceeded to the coin shop and McFadden and Hudson entered the shop. After they had been in there a couple of minutes, Riggins came to the door and brandished a shot gun and defendant pulled his revolver and announced a stick-up. McFadden saw the man behind the counter reach under the counter and saw defendant commence firing at him. They then fled in the car and were pursued by another car. The defendant tried to break the

side window of the car with his pistol, and being unsuccessful, broke the rear window out with his shot gun. The car which was pursuing them then slowed down. The chase ended at a deadend street and McFadden, Riggins and the defendant fled on foot.

On cross-examination McFadden testified that he had previously been convicted of three felonies and that he was a former narcotics addict. He also admitted that he had been indicted for the murder of the coin shop owner but that the charge against him had been dismissed. He admitted that his attorney had made a deal with the prosecutor to dismiss the charges against him if he testified for the State, but stated that the prosecutor told him that they expected him to testify truthfully.

Klemens Lorentz testified that he saw a suspicious man approaching the coin shop and that after this man entered the shop he heard an alarm go off. He then saw three men emerge from the shop and identified the defendant as one of the men. He saw the defendant about 45 minutes later in the shop in the custody of the police.

Robert Neldon testified that he was eating lunch in the parking lot of a drive-in restaurant across the street from the coin shop. He heard the burglar alarm ring and saw two men leave the store and drive away. He started following the car and pulled up along side of it. He then saw one of the men in the back point a gun at him and identified the defendant as this man. He then drew back and followed from a distance and saw the car stop and three men run away. He next saw the defendant at a police station and identified the defendant at that time as the man he had seen in the get away car.

A police officer testified that after receiving a radio broadcast of the crime he arrested the defendant and took him back to the shop.

John Smith testified for the prosecution, and it appears from his testimony that he was the man referred to as

"John" in McFadden's testimony. He confirmed that Riggins, McFadden and the defendant were present in his home at the time testified to by McFadden and he "went and got an automobile." He testified on cross-examination that he had 8 indictments pending against him for the theft of automobiles.

The wife of the deceased testified that she was in the store shortly before the crime and that when she returned her husband had been shot and that he was pronounced dead upon arrival at the hospital.

With the exception of technical evidence with respect to the gun, the bullets and the cause of death, this was substantially all of the evidence offered on behalf of the prosecution. The defendant did not testify or offer any witnesses and the defendant Riggins offered certain alibi witnesses in his defense.

We next consider defendant's claim that Debus, Lorentz and Neldon should not have been permitted to make an in-court identification of defendant because each of them had made a pretrial identification which was tainted by impermissible and suggestive procedure on the part of the police. Defendant points out that on each occasion of the pretrial identifications, the defendant was presented to the witness alone and in police custody and no line-up procedure was used. The pretrial identifications took place before the decisions of the United States Supreme Court in *United States* v. *Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, and *Gilbert* v. *California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951. Therefore, the identifications were not defective as a matter of law because of the absence of counsel, and the question is whether the identification proceedings were so suggestive as to deprive the defendant of due process of law and whether the witnesses had an independent source for identification, aside from the confrontation following defendant's arrest. (*Stovall* v. *Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) Debus's testimony was that he had

observed defendant for about 30 seconds in the store. When it is considered that he was the witness to a violent crime and that he was confronted by a person armed with a deadly weapon it seems apparent that he had adequate opportunity and reason to recall the appearance of the murderer. Lorentz was only about 20 feet away from the store and had an opportunity to observe the robbers for about 30 seconds in broad daylight. Neldon testified that he pulled along side the fleeing car and observed the defendant pointing a gun at him. The in-custody identifications occurred a short time after the crime and after defendant's arrest. A similar identification, made immediately after a robbery, was upheld in *United States ex rel. Williams* v. *LaVallee* (2d cir.), 415 F.2d 643. In upholding the identification the Court of Appeals said: "Here, the identification was made almost immediately after the alleged robbery, not, as in *Rutherford,* several days later. Therefore, not only is the probable accuracy of the identification much more likely, but also as Judge (now Chief Justice) Burger has said, an immediate confrontation is desirable for it 'may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.' *Bates* v. *United States,* 405 F.2d 1104, 1106." In view of the adequate independent source of the witnesses' identification and the immediacy of the confrontation, we are of the opinion that the witnesses were properly permitted to testify as to their identification of defendant. This holding also disposes of defendant's claim that the court should have conducted a pretrial hearing to determine the validity of the pretrial identifications. The court had before it the testimony of the identification witnesses at the former trial and ruled that there was sufficient independent source of identification. The court did not err in denying the motion for a pretrial hearing on a motion to suppress the identification.

We turn now to a consideration of defendant's claim

that the evidence was insufficient to establish his guilt. Our previous summary of the evidence is sufficient to refute that claim. Either the testimony of McFadden, uncorroborated by any other evidence, or the testimony of the three identification witnesses, without further corroboration, would have been sufficient to establish defendant's guilt. The combination of the detailed recital by McFadden of defendant's complicity and the identification, if believed by the jury, provided overwhelming evidence of defendant's guilt. Defendant also argues that the identification testimony is suspect because the witnesses did not have an adequate opportunity to observe the defendant. The facts concerning the ability of these witnesses to make their observations were brought out before the jury and the credibility of the testimony was a matter for the jury to determine. Defendant also argues that the testimony of McFadden was not worthy of belief because he had been promised immunity and because he was a convicted felon and an admitted former user of narcotics. It is well established that the testimony of an accomplice, even though it is attended with infirmities such as a promise of leniency, is sufficient to sustain a guilty finding. (*People* v. *Wollenberg,* 37 Ill.2d 480, 484.) The jury was well aware of McFadden's convictions, his former use of narcotics, and the fact that he had been promised leniency. These facts were argued forcefully by counsel for the defendant and the jury was instructed that the testimony of an accomplice is subject to suspicion and should be acted upon with caution. The jury presumably took these factors into consideration in their deliberations and believed McFadden's testimony. In our opinion, the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt.

Certain other contentions of the defendant involve the testimony of the witness John Smith. In accordance with the provisions of section 114—14 of the Code of Criminal Procedure (Ill. Rev. Stat. 1967, ch. 38, par. 114—14)

counsel for the defendant Riggins served a notice of an alibi defense on the prosecution and listed as one of the alibi witnesses the name and address of Smith. A police officer visited Smith's home and interrogated him briefly, without obtaining any significant information. He then obtained a picture of Smith and another officer took that picture together with 6 others to McFadden, who identified the picture of Smith as the man called "John", who got the automobile for them. The officers subsequently stopped a car driven by another person, in which Smith was a passenger. Smith was taken by the officers to a police station where he was questioned by an assistant State's Attorney. Counsel for Riggins learned of this and moved for a mistrial and requested a hearing regarding the circumstances of Smith's interrogation. He also moved that one of the police officers and the prosecutor be held in contempt of court. Counsel for the defendant Hudson did not at that time join in the motions but simply requested a copy of an unsigned statement which Smith had given the prosecutor. The statement was furnished to counsel and a hearing was held on the motions. The prosecutor testified that when he received the list of alibi witnesses, he gave a copy to a police officer and instructed him to attempt to interview the witnesses. He subsequently instructed the officer to obtain a photograph of Smith and other individuals and show them to McFadden. The officer did so and advised the prosecutor that McFadden identified Smith as the fourth man present at the time the robbery was being planned. The prosecutor was notified of Smith's apprehension and proceeded to the station where he questioned him. He did not advise Smith that he was entitled to counsel. Following the questioning, Smith was released to go to work and a police officer drove him to his place of employment. He testified that he did not in any way threaten or intimidate Smith.

Smith testified that earlier on the evening in question he had been at the office of the attorney for Riggins. He

returned home, obtained his work clothes, and got in a car driven by one John Tillman. The car was stopped by a police officer and Smith was removed from Tillman's car. He was told that he was under arrest for being involved in a murder and that he could be charged with murder. He testified that when the prosecutor arrived he told Smith to tell the truth and said that nobody was going to hurt him. He testified that he gave the statement, which implicated defendant and Riggins, because he did not want to be charged with murder. He also testified that he told the police officer that they could bring the State's Attorney to the station and he would tell them the truth and that whatever McFadden said was the truth.

The police officer testified concerning the identification of the photo and the circumstances of Smith's apprehension. He testified that on the way to the station Smith said that he knew why they had him and that he wanted to talk to somebody because he did not want to get on the stand and perjure himself. One of the officers testified that he asked Smith if he realized he could be charged with the crime of murder and Smith said that he did realize that and that he was not going to the penitentiary for anyone.

At the conclusion of the hearing, counsel for Hudson and Riggins made a motion that Smith's testimony for the State be suppressed. The court denied that motion and the motions seeking a mistrial and a finding of contempt. The court made a finding that Smith's statement was voluntary, without any duress or intimidation. Smith then testified for the prosecution as previously related in this opinion.

On this appeal defendant renews his contention that Smith should not have been permitted to testify because the police and prosecution used impermissible tactics. Defendant's contention is based in part upon the fact that Smith was not advised of his rights as required by *Miranda* v. *Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, prior to his interrogation. A similar claim was advanced

by the defendant in *People* v. *Denham*, 41 Ill.2d 1. In that case defendant moved to suppress certain physical evidence on the ground that its seizure stemmed from information obtained during an unlawful interrogation of persons other than the defendant. The court held that the safeguards established in *Miranda* were personal in nature and the absence of *Miranda* warnings during the questioning of a witness other than the defendant could not be raised by the defendant. In addition to the *Miranda* claim defendant argues that Smith was improperly induced to give a statement to the prosecution by threats of prosecution for murder and promises of leniency and that he was induced to testify for the prosecution because of his allegedly coerced statement. Defendant argues forcefully that there are strong policy considerations which should forbid the introduction of any testimony which is the production of coercion, but we need not discuss these considerations. The trial judge, after hearing the testimony of all persons involved, made an express finding that there was no duress or intimidation of any kind or nature and that Smith's statement was freely and voluntarily given. We are satisfied from a review of the record that this finding was correct.

Although defendant does not specifically attack the validity of the provision requiring notice of an alibi defense, he does claim that the State should not be permitted to question an alibi witness without prior judicial authority. It is relevant to note that the United States Supreme Court has recently upheld the validity of a statute requiring notice of an alibi. In *Williams* v. *Florida*, 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893, the defendant gave notice of an alibi defense and the prosecutor summoned one of the alibi witnesses to his office and took her deposition. The alibi witness testified for the defendant at the trial and the prosecutor used her deposition, which was inconsistent with her trial testimony, to impeach her. The Supreme Court summarily disposed of defendant's contention that the dis-

covery permitted the State deprived him of due process of law or a fair trial, stating that "We need not linger over the suggestion that the discovery permitted the State against petitioner in this case deprived him of 'due process' or a 'fair trial,' \* \* \* The adversary system of trial is hardly an end to itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as 'due process' is concerned, for the instant Florida rule, which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence." (26 L. Ed. 2d at 450.) Having determined that the questioning of Smith was not coercive the situation here is practically the same as that in *Williams*. The trial court did not err in permitting Smith to testify.

The hearing on the motion by Riggins's counsel for a mistrial and for a contempt finding was held in chambers and the defendant was not present. Defendant argues that he was therefore deprived of his constitutional right to be present at all stages of his trial. The record discloses that counsel for the defendant waived defendant's presence at the hearing, but defendant correctly points out that the right to be present cannot be waived by counsel. (*People v. Mallett*, 30 Ill.2d 136, 142.) However, the court may hold hearings outside of defendant's presence where substantial rights of the accused are not involved. (*People v. Woods*, 27 Ill.2d 393.) A hearing on a rule to show cause why counsel should not be held in contempt of court does not involve the substantial rights of the accused and his presence is not required. (*People v. Miller*, 13 Ill.2d 84, 112.) The hearing was brought about by the motions of Riggins's counsel for a mistrial and for a contempt finding. Insofar as the hearing was concerned with a finding of contempt the *Miller* case is decisive. Counsel for the defendant did not

join in the motion for a mistrial and it was not until the conclusion of the hearing that counsel for the defendant moved that Smith's testimony be excluded. The motion for a mistrial as to Riggins did not involve a substantial right of the defendant Hudson. Underlying both motions, an issue was presented as to whether the rights of the *witness* had been violated. This issue likewise did not involve a substantial right of the defendant. A further factor to be considered is that when Smith testified before the jury the circumstances of his arrest and questioning were fully elicited, so that the jury could judge the credibility of his testimony. In our opinion the proceedings in chambers were not of such a nature as to require the presence of the defendant.

Also in connection with the testimony of Smith defendant contends that the court erred in permitting the prosecutor to question Smith at length concerning the contents of the statement during the hearing out of the presence of the jury. We note at the outset that counsel for Hudson did not object to reading extensively from the statement although Riggins's attorney did make repeated objections to the procedure. The contents of a statement may not always be relevant in determining whether the statement was voluntary, but in some circumstances the contents of such a statement has been considered, not to determine the truth of the facts set forth in the statement, but as a circumstance bearing upon the voluntary nature thereof. For example, in *People* v. *Scott,* 29 Ill.2d 97, in upholding the voluntary nature of a confession the court considered the length of the statement and the type of answers given by the defendant, which tended to show that the defendant was in full possession of his faculties and aware of his rights and that his will had not been overborne. In the present case the statement was not presented to the jury and we find no error in the proceedings in chambers.

Defendant next contends that evidence of an admission

by Riggins, implicating Hudson, was improperly admitted. The testimony in question came during the examination of McFadden. He testified that when he was taken to a police station a jailer told him "the boys they got back there are mad at you." On motion by counsel for Riggins the answer was stricken. McFadden was then asked whether he had a conversation with Riggins and he said that Riggins called him a stool pigeon. Defendant argues that the statement of the jailer that "the boys" were mad at McFadden could only mean that Hudson and Riggins were angry with him for implicating them. Defendant also argues that testimony that Riggins called McFadden a stool pigeon was an implied admission that Riggins and Hudson were guilty. The testimony in question does not readily lead to the conclusion asserted by the defendant and falls far short of the type of incriminating statement forbidden by *Bruton* v. *United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. Further, counsel for Hudson did not object or move to strike either of the allegedly improper remarks and the motions by Riggins's counsel to strike the first statement was sustained. We find no prejudicial error.

Defendant asserts that he was prejudiced by the fact that the deceased's wife was emotionally upset when she gave her testimony. Counsel for the defendant made a motion for a mistrial at the conclusion of her testimony on the ground that the witness was sobbing and crying throughout her testimony and at the conclusion thereof she had to be assisted from the chair by the bailiff and that her son had to come from the back of the courtroom to assist her. The court observed for the record that the witness was sobbing during the course of her testimony and that she was assisted from the witness stand, but stated that he was sure the reporter had no difficulty in understanding her and stated that it appeared that the witness intended to join her son who was seated in the rear of the courtroom and that the son came forward to assist her. The court denied a mo-

tion for mistrial. This court has pointed out that on a plea of not guilty the State has the right to prove every element of the crime and is not obliged to rely upon an offer to stipulate certain evidence. (*People* v. *Speck,* 41 Ill.2d 177, 201.) The witness's testimony was brief and was elicited to prove the identification of the decedent and his death. There was no attempt to obtain the jury's sympathy by dwelling at length upon the fact that the deceased left a family, a practice which has been condemned by this court. (*People* v. *Bernette,* 30 Ill.2d 359.) We are of the opinion that the fact that the widow was emotionally upset does not constitute prejudicial error requiring a reversal.

It is urged that the final argument of the prosecutor was so prejudiced that defendant was deprived of a fair trial. We do not find it necessary to consider this argument in detail. The record shows that in none of the instances now complained of did the counsel for the defendant object. The alleged improper arguments were therefore waived and will not be considered on appeal. (*People* v. *Underhill,* 38 Ill.2d 245.) We also note that most of the present arguments are concerned with the claim that the jury imposed the death penalty because of the improper arguments. Since we have held that the death penalty cannot stand, the argument loses much of its weight, especially in view of the clear evidence of guilt.

Defendant's final argument is that the death penalty is unconstitutional. While several arguments are advanced in support of this contention it is unnecessary to consider them in view of the fact that the death penalty is to be vacated.

After a review of the entire record and a careful consideration of all of the points made by the defendant, we are of the opinion that the defendant's guilt was established beyond a reasonable doubt and that there were no prejudicial errors requiring reversal of the judgment of conviction. However, for the reasons heretofore stated, the death penalty must be set aside. The judgment of conviction of

the circuit court of Cook County is affirmed. The sentence of death is vacated and the cause is remanded to the circuit court with directions to resentence the defendant to a penalty other than death.

*Affirmed, and remanded for resentencing.*

KLUCZYNSKI and WARD, JJ., took no part in the consideration or decision of this case.